George Leighton PHILLIPS, Plaintiff,

v.

Oscar SELTZER, Leo A. Seltzer and Fred Morelli, individually and as partners trading as The Roller Derby or Roller Derby Associates, and The Roller Derby, Inc., a corporation, and Roller Derby Associates, a corporation, Defendants.

United States District Court
S. D. New York.
June 29, 1955.

John E. Morris, New York City, for plaintiff.

Mendes & Mount, New York City, B. C. Kelly, New York City, of counsel, for defendant.

EDELSTEIN, District Judge.

Findings of Fact

1. Plaintiff is a citizen of New Jersey.

2. The defendant Leo A. Seltzer (the only defendant served with process in this case), together with Oscar Seltzer and Fred Morelli, individually and as persons trading as Roller Derby Associates, are citizens of the State of Illinois.

3. The amount in controversy exceeds the sum of $3,000 exclusive of interest and costs.

4. On November 16, 1950, the defendant, Leo A. Seltzer, was engaged in the promotion of an exhibition of roller skating known as the Roller Derby and this exhibition was held at the Teaneck Armory in Teaneck, New Jersey.

5. The lease between the defendant and the Department of Defense, State of New Jersey, granted to the defendant

as lessee the use of the drill floor, lavatory facilities, and whatever dressing rooms were available, to conduct a roller derby in the National Guard Armory situated in the Town of Teaneck for the days of 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 and 26, November 1950, on a twenty-four-hour basis.

6. The same lease also provided that the lessee would assume full and complete responsibility for the safety of the public during this occupancy.

7. The invitation to the public, including the plaintiff, extended to the use of the grounds surrounding the premises for automobile parking and for ingress to and egress from the ticket windows at which the admission fee was to be paid and to and from the interior of the armory building itself.

8. On November 16, 1950, at about 7:15 p. m., the plaintiff arrived at the Teaneck Armory to attend a roller derby exhibition.

9. The plaintiff drove his automobile from his home in West Englewood to the armory in Teaneck, a distance of about one and one half miles, and after arriving at the armory stopped the vehicle on the southwest corner of the armory grounds to allow his father to alight from the car and walk to the general admission ticket window.

10. After his father alighted from the automobile, the plaintiff drove to the southeast portion of the armory premises and parked his car in the parking area provided at that location.

11. The Teaneck Armory ran longitudinally east and west.

12. The front of the armory was at the west end and this faced Teaneck Road.

13. There were parking areas for patrons of the Roller Derby on three sides of the armory grounds—the south, north, and east.

14. The weather conditions were clear and dry when the plaintiff arrived at the armory.

15. Following a conversation with a young man who was holding a flashlight and directing the parking of cars, the plaintiff walked about 40 feet to the southeast corner of the armory building.

16. The plaintiff made a left turn around the southeast corner of the armory building and commenced walking in a northerly direction with the east end of the armory to his left.

17. Reserved seat tickets were sold at the west end of the armory.

18. There was a general admission entrance located at about the center on the north side of the armory.

19. The plaintiff's father walked to the general admission entrance on the north side of the armory and stood in the line to purchase general admission tickets for himself and the plaintiff.

20. The west end of the armory was well lighted with electric lights.

21. The south side of the armory had only two electric lights lit, one over each doorway.

22. The north side of the armory had two electric lights lit, one over each doorway.

23. The east side of the armory had no electric lights provided on the outside of the building.

24. The light that came through the windows at the east end of the armory was not sufficient to throw any appreciable amount of light on the ground at the east end of the armory.

25. There were no sidewalks around the armory except for one walk that was located across the roadway at the westerly end of the armory; although a blacktop roadway was constructed along the southerly side of the armory after the plaintiff's accident, there was no such roadway in existence at the time of the occurrence on November 16, 1950.

26. On November 16, 1950, an invited patron who parked his car in the southeasterly parking area, as did the plaintiff, did not have available either a roadway or walk which extended from that area along the southerly side of the building to the west end of the armory or in a northerly direction along the east end

of the armory, to any of the entrances where Roller Derby tickets were sold.

27. As the plaintiff walked in a northerly direction over the grass along the easterly portion of the premises, it was semi-dark but the plaintiff could see the ground in front of him.

28. The visibility at the easterly end of the armory, where the plaintiff was walking, was about three or four feet ahead of him along the ground.

29. Other objects that were silhouetted could be seen for a distance of 100 feet.

30. As the plaintiff was walking in a northerly direction along the east end of the armory, he observed a wooden fence silhouetted about 100 feet in front of him.

31. After observing the fence about 100 feet in front of him, the plaintiff changed his walking course from due north to a northeasterly direction.

32. The plaintiff walked past an iron railing to his left that extended out from the armory building.

33. As the plaintiff passed the iron railing to his left he observed the ground on which he was walking beginning to slope gradually downward.

34. The plaintiff continued walking down the gradual descent in a northeasterly direction to avoid the wooden fence ahead of him.

35. There were three or four groups of people some distance ahead of the plaintiff who were walking in the same general northerly direction as the plaintiff was walking.

36. The plaintiff suddenly and unknowingly came upon a crumbling wall with loose stones upon it, and which was obscured from view by reason of a grassy ledge which overhung this wall.

37. As the plaintiff's right foot came down on a loose stone atop the rubble wall, which stone gave way underfoot, he was thrown forward with his left foot extended and dropped about three feet to a driveway below.

38. The crumbling wall from which the plaintiff fell was along the southerly side of a depressed driveway which led into a basement in the center of the east end of the armory.

39. The embankment from which the plaintiff fell was not protected by a fence, barricade, or safeguard of any kind.

40. The embankment on the northerly side of the depressed driveway was protected by a wooden fence on top of the northerly embankment.

41. The armorer in charge of the armory for the National Guard, Colonel Becker, prior to the date of this occurrence on November 16, 1950, had observed many people walking from south to north in the vicinity of the embankment where the plaintiff sustained his injuries.

42. The police officer who responded to the scene of the occurrence had previously seen many people walking from south to north across the east end of the armory while the Roller Derby was in progress.

43. The same police officer had previously observed people walking from south to north over the very embankment where the plaintiff was injured.

44. When the police officer arrived at the scene he found the visibility to be about eight or ten feet along the ground, although objects of some size could be distinguished some 15 to 20 feet away; a condition of total darkness did not exist.

45. At a deposition of the defendant, Kenneth Gurian stated that he was the unit manager for the Roller Derby, and testified that the only inspection outside the building that was made by anyone associated with the Roller Derby was a daily check on the sign in front or at the west end of the building.

46. No agent or employee associated with the Roller Derby made any inspection of the armory grounds between November 9 and 16, 1950, according to the testimony of Kenneth Gurian at the deposition of the defendant.

47. At the same deposition of the defendant this agent testified that if he was not mistaken there was a light high up over the basement which illuminated the cut in the ground at the easterly side of the armory, and this light was illuminated on November 16, 1950. In contrast to this testimony, there actually were no artificial lights provided at any place outside the easterly side of the armory, at the cut in the ground where the plaintiff fell, or elsewhere on the easterly side, on November 16, 1950.

48. Although the plaintiff had been to the armory for other functions on prior occasions, he had previously been able to park his car near the west end of the armory.

49. When the plaintiff was injured on November 16, 1950, this was the first time that he had ever walked across the easterly end of the armory.

50. The plaintiff was not familiar with the physical characteristics of the terrain along the easterly side of the armory prior to the occurrence on the evening of November 16, 1950.

51. The unprotected, unguarded, and unlighted embankment from which the plaintiff fell was a danger and hazard to patrons of the defendant who were walking from a parking area to the admission entrances.

52. There were no signs posted outside the armory indicating the directions in which the patrons of the Roller Derby should walk.

53. In pursuing the course he was following the plaintiff would have to walk approximately one width of the armory and one half the length of the armory in order to reach his destination at the general admissions entrance on the north side of the armory; if the plaintiff had turned left and walked to the front of the armory, he would then have to walk one length, one width and another one half length of the armory to arrive at the general admission ticket entrance on the north side of the armory.

54. In walking as he did the plaintiff was following the most direct course to his destination; Colonel Becker estimated that this direct course was about 280 feet in length, whereas the indirect course around the westerly end of the building would be about 800 feet in length.

55. There was no guard or other individual to direct patrons of the Roller Derby where to walk, or where not to walk, in going from the southeasterly parking area to the armory entrances.

56. While the Roller Derby was in progress, between November 9, 1950 and the date of the plaintiff's accident on November 16, 1950, there was ample opportunity for the defendant to become aware of the dangerous condition for pedestrian patrons that existed on the grounds immediately east of the armory.

57. The defendant did not act as a reasonably prudent person should act under such circumstances in that he failed to install an electric light, or place an employee at that location as a guard, or erect some sign, fence, barricade, or other safeguarding device, to prevent a member of the invited public from falling off the obscure and dimly lit embankment while walking from a parking area to an admission door.

58. According to Mr. Carl Mullins, a manager of the Roller Derby, there were 250 general admission seats, and 2,700 reserved seats, available for the performance at the Teaneck Armory on November 16, 1950.

59. Mr. Mullins further testified that the reserved seats, of which there were 2,700, could be purchased in advance; whereas the 250 general admission tickets were sold on the basis of "first come, first served" at the armory, commencing at 7:00 p. m. on November 16, 1950.

60. The plaintiff was an invitee and business patron of the defendant at the time and place of this occurrence.

61. The defendant owed to this admittedly invited plaintiff the duty of reasonable care in providing a safe place of ingress from the parking area to the admission entrances of the armory.

62. The plaintiff was taken to the Holy Name Hospital immediately after the occurrence on November 16, 1950 and remained at this hospital until November 20, 1950.

63. At the Holy Name Hospital the X-ray report of plaintiff's left leg showed a comminuted fracture involving the upper portion of the tibia; the fracture line apparently entered the anterior portion of the joint; there was some depression of the entire group of fracture fragments; the depression was more marked along the medial joint surface; there was an associated fracture of the head of the fibula with separation of the fracture fragments.

64. The plaintiff left Holy Name Hospital on November 20, 1950, by ambulance and returned home.

65. He resumed teaching music in the Ridgewood school system about December 5, 1950, with a cast on his left leg extending from the ankle to the hip, and taught while sitting in a wheelchair.

66. On December 21, 1950, the cast was removed from the plaintiff's leg and a steel brace was applied; he used crutches to get about until February 21, 1951.

67. After the crutches were discarded in February, 1951, the plaintiff has used a cane up to the present time in order to assist him in walking.

68. The plaintiff wore a steel brace on his left leg continuously for almost a year and a half after December 21, 1950.

69. The plaintiff's left leg was weak, and at one time the leg gave way under him and he fell sustaining a fractured toe.

70. On September 28, 1953, the plaintiff was admitted to the Valley Hospital in Ridgewood, New Jersey, and remained at this hospital until October 4, 1953; while in the Valley Hospital Dr. Bump found a detached medial meniscus or ruptured semi-lunar cartilege in the left knee and this torn cartilege was removed by surgical operation.

71. There is a scar along the inner surface of the plaintiff's left knee at the site of the operation for removal of the ruptured semi-lunar cartilege in 1953.

72. There is atrophy of the muscles of the plaintiff's left leg above the knee and considerable weakness in this limb.

73. The plaintiff's left leg between the knee and the ankle is bowed to the extent of five degrees and this malformation gives the appearance of a crooked and bent leg.

74. There is a three-quarter-inch shortening in the plaintiff's left leg which requires him to wear a built-up shoe to compensate for the difference in length of his legs.

75. When the plaintiff walks he limps on his left leg and it is necessary for him to lock the knee out straight before he can bear weight on the left leg.

76. The plaintiff has a permanent 33⅓ percent loss of use of the left leg.

77. The plaintiff was examined by a doctor on behalf of the defendant immediately following the time when the defendant took the plaintiff's deposition; although this examining doctor for the defendant was present in court during a part of the trial, and viewed some of plaintiff's x-rays which were introduced into evidence, the defendant did not call the doctor as a witness in his behalf.

78. The injuries described above were proximately caused by the negligence of the defendant in the occurrence on the grounds of the Teaneck Armory when the plaintiff was injured on November 16, 1950.

79. The plaintiff's injuries are of a permanent and disabling nature, although they will not prevent him from performing his duties as a teacher of music for the Ridgewood Board of Education. The plaintiff is 43 years old, and was 38 at the time of the accident. Since his confinement in Valley Hospital in 1953, he has lost no time from his duties as a teacher of music.

80. Plaintiff lost no salary as a teacher of music following the accident and following the confinement in the Valley Hospital in September, 1953.

81. Plaintiff's special damages were: Holy Name Hospital, $96; Dr. Apold, between $250 and $300; leg appliance, $38; x-rays, $20; wheel chair, $12.50; shoes, $40; Valley Hospital, $105; Dr. Bump, $225; additional x-rays, $25.

Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter.

2. The defendant was guilty of negligence which was the proximate cause of the injuries sustained by the plaintiff on November 16, 1950.

3. The plaintiff was free from contributory negligence in the occurrence.

4. The plaintiff is entitled to judgment against the defendant in the sum of $20,800, together with costs.

Decree accordingly.